# Richmond

## ALMEDA BALTIMORE, ET ALS. V. BENEDICT COAL CORPORATION.

March 13, 1944.

Record No. 2797.

Present, Campbell, C. J., and Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*Robert B. Ely*, for the appellants.

*Pennington & Pennington*, for the appellee.

CAMPBELL, C. J., delivered the opinion of the court.

Almeda Baltimore, for herself and dependent children, filed a claim with the Industrial Commission, seeking compensation for the death of her husband, Everett J. Baltimore. The application alleges that Everett Baltimore, an employee of appellee, came to his death as the result of an accident arising out of and in the course of his employment while engaged in work for appellee.

The full commission was present at a hearing which resulted in a two to one decision against the claim for compensation.

The sole question involved in this appeal is whether or not there was an accident arising out of and in the course of employment, which resulted in the death of Everett J. Baltimore.

The deceased was a young man twenty-eight years of age, weighing one hundred and thirty-seven pounds, and five feet, nine inches tall, who had never been sick in his life. The injury (allegedly, suffocation by carbon monoxide and other poisonous gases), occurred on February 28, 1942. Death occurred on March 1, 1942.

Deceased was an experienced miner who had been in the employ of appellee for a period of five years. On the day of the alleged accident he was working at number 11 mine, in room 17. This room was customarily supplied with air by means of a booster fan which had, however, not been in operation for approximately a week prior to the injury. On the day of the occurrence, five men, including deceased, were working in room 17. The deceased was engaged in the operation of an electric drill in a remote part of the room, at 2:30 p. m., when the alleged injury developed.

It appears in the evidence that the usual mode of operation in the mine is to cut the coal with an electric drill and then blast it with an explosive. The defendant, for the purpose of blasting the coal, used a chemical product sold under the trade name of Cardox, known as a permissive mine explosive. Cardox is liquid carbon dioxide which, upon sudden release, expands into a gaseous state, thus causing an explosion. Cardox is contained in cylinders approximately four feet in length by two inches in diameter, which are inserted into the coal and detonated by electric current. Following the explosion, the gas is discernible to the naked eye, and also following the detonation of the Cardox cylinders, certain quantities of gaseous carbon dioxide, carbon monoxide and other gases are released. There is evidence that carbon monoxide is a poisonous gas and has a greater chemical affinity for the hemoglobin of the blood than any other known gas.

On the day of the injury to deceased there had been from ten to fifteen detonations of Cardox in chamber 17, the latest having occurred an hour to an hour and a half before the injury to the deceased. Electric machinery, such as the electric cutting machine and electric drill, was operated in the chamber following such blasts of Cardox. There was no way to rid the chamber of gas, except through its escape by such draft or air as was in the chamber.

It is conclusively shown that while operating the electric drill, as aforesaid, between 2:30 and 3 o'clock p. m., the deceased developed a severe headache; that he complained of it and, upon the advice of a fellow employee, stopped work and went, seeking relief, to the main current of air where he waited until the rest of the crew completed their work. When the men arrived at the coal conveyor they found Baltimore on his knees, throwing blocks of coal into the conveyor. He then complained of headache, became nauseated and tried to vomit. Along with the other men, Baltimore rode the conveyor out of the chamber, walked to the outside and got on the man car to ride down the decline. While on this journey he began to lean upon his arms and when he reached the foot of the decline he had lost muscular control of his legs and had to be assisted from the man car. He was placed in an automobile and conveyed to the Lee General Hospital at Pennington Gap, Virginia. Upon arrival at the hospital, his face became flushed, he had great difficulty in breathing, lapsed into unconsciousness and died at 7 o'clock the following morning. Two days after his death, E. A. Starling, a Kentucky mine inspector, made, or had made, a test of the blood of deceased and though the blood had decomposed, he found a trace of carbon monoxide in the blood system.

In *Molnar* v. *American Smelting, etc., Co.,* 127 N. J. L. 118, 21 A. (2d) 213, this is said:

" * * the requirement that the injury or death arise by accident, * * is satisfied if the claimant discharges the burden of proving that the condition complained of, *i. e.,* the

injury or death, is related to or affected by the employment, that is to say, if but for the employment it would not have occurred."

In a dissenting opinion, Deans, Commissioner, set forth the following facts with which we are in thorough accord: Four witnesses testified that on the day of the injury the air in room 17 was bad; two witnesses testified as to the condition of Baltimore, viz., that he complained of headache and was nauseated; that when he left the mine he was unable to walk.

It further appears that one Luther Cox, foreman of appellee, was informed by the men working in room 17 that the air was bad, but, by his admission, nothing was done to alleviate the condition, as required by section 1855, (b), of the Code; that the booster fan was reinstated after the death of Baltimore; that on the day of the accident an electric machine and an electric drill were in operation.

The medical evidence introduced by appellee is as follows:

Though no *post mortem* was had, Dr. G. B. Setzler signed the death certificate, showing the cause of death as "Cerebral Edema; cause undetermined, duration February 28th, 1942, 15 hours."

Dr. B. C. Griggsby was asked: "Please explain the result of your investigation as to the amount of carbon monoxide necessary to cause ill effects, and from then on until death."

His answer was: "A 25% concentration of carbon monoxide in the blood will give signs of beginning of carbon monoxide poisoning, and, if the saturation comes up to 75%, then the diagnosis is bad. And your first symptom that you get of carbon monoxide are headache, dizziness, nausea, occasionally vomiting; and then, as the saturation becomes greater, you get coma and unconsciousness and loss of voluntary and involuntary muscular control."

He was also asked the following question and gave the following answer:

"Q. In view of your investigations on the subject and of your reading on the subject, please state, if the fact that

Everett J. Baltimore was unaccountably stricken for some reason and later dies, and the fact that other fellow workmen worked with him at the time, why they felt nothing more than, as one stated, a weakness.

"A. If the concentration was great enough to produce a fatal effect in that man, I do not see why it did not affect the other men working with him."

The medical evidence of appellant is based on the testimony of Dr. Frank E. Handy. Commissioner Deans epitomizes this evidence in this language:

"Dr. Frank E. Handy, of the Masonic Hospital of Appalachia, Virginia, has had broad experience with industrial accidents and has had opportunity to observe the effects of carbon monoxide in persons. There are two principal factors, according to this witness. The immediate symptoms are those a person notices, such as headaches, dizziness and nausea. As the symptoms progress he may become completely unconscious, lose voluntary control of his whole muscular system, which starts from the lower extremities and proceeds to the trunk. There might be different variations of these things in different individuals. A florid complexion is characteristic. He was asked as to how carbon monoxide would affect a 28-year-old who was always healthy, and replied that it would affect him more rapidly and more seriously, because the younger the individual the greater is the respiration in proportion to the blood and is more quickly apt to be overcome. Ordinarily if one is overcome with carbon monoxide and lives for some 16 to 17 hours, it is possible that he could throw off all that carbon monoxide and yet die. The carbon monoxide is eliminated mainly by breathing but because of the intake of this noxious gas it is still possible that he would die of shock, even if he got rid of the carbon monoxide. It was his opinion that carbon monoxide could be produced by electric machinery, or by electrolysis convert carbon dioxide into carbon monoxide, and it was his further opinion that if carbon dioxide was present in a chamber in a mine where there was no fan,

and electric machine was running, such as coal-cutting machines and electric drills, that the operation of this electric machinery would have the tendency to convert carbon dioxide into carbon monoxide. The presence of five-tenths of one per cent. of carbon monoxide in the air would produce noticeable symptoms according to the leading authorities he had studied. He has observed at least ten or twelve cases in his nineteen years of practice. Many physicians who have limited experience never see one under the influence of carbon monoxide poisoning. He admitted that none of these he had seen had died from the exposure. The hemoglobin in the blood has a great affinity for carbon monoxide, greater than any other known gas. When one is carried from the presence of carbon monoxide into the fresh air there is still some permanency of the blood combination. The presence of one per cent. of carbon monoxide in the blood in his opinion would be fatal and that very decided symptoms are noticeable with five-tenths of one per cent. The reaction depends on the type of the individual and the length of exposure. He considered the bulletins prepared by the Public Works Department of the Bureau of Mines or the United States Government of Mines as authoritative. Where one is compelled to breathe faster because of his work, according to this doctor, he actually takes in carbon monoxide faster and in larger quantities."

In a bulletin issued by the Bureau of Mines, it appears that the symptoms caused by a percentage of 30 to 40 of carbon monoxide in the blood is as follows:

"Severe headache, weakness, dizziness, dimness of vision, nausea and vomiting, and collapse."

It is thus seen that all of the medical evidence is in agreement on the subject of symptoms. The only conflict in the medical evidence is one of degree.

Dr. Griggsby, after consulting medical authorities, was unable to determine why the other occupants of room 17 were not similarly affected. Dr. Handy, after nineteen years of experience, was of opinion that the presence of one per cent. of carbon monoxide in the blood would prove fatal.

In *Byrd* v. *Stonega Coke, etc., Co., ante*, p. 212, 28 S. E. (2d) 725, Mr. Justice Hudgins said:

"While a claimant has the burden of establishing his claim, he should not be required to establish causal connection between the accident or extra hazardousness of his employment and the injury beyond all reasonable doubt. A strong natural inference should tip the scale in favor of the claimant when medical experts materially differ or assign merely probable and conjectural reasons for their conclusion."

In *Bristol Builders' Supply Co.* v. *McReynolds*, 157 Va. 468, 162 S. E. 8, this is said:

"The general rule is that when an attending physician is positive in his diagnosis of a disease, great weight will be given by the courts to his opinion. However, when it appears, as we think it does appear in this case, that the diagnosis is shaded by doubt, and there is medical expert opinion contrary to the opinion of the attending physician, then the trier of the fact is left free to adopt that view which is most consistent with reason and justice."

Without dissent, the medical experts agree that carbon monoxide in the blood produces headache, dizziness, nausea and loss of muscular control.

In the case at bar, the evidence of the lay witnesses relative to the symptoms exhibited by Baltimore while in the mine and after his removal to the hospital conclusively and logically demonstrate that his condition was brought about by the inhalation of carbon monoxide gas. The fact that the other occupants of room 17 were not overcome by gas is of no probative value. As stated, it appears that Baltimore was working an electric drill in a remote section of the room where (by inference, at least), the fumes of monoxide gas were stronger.

In our opinion, Everett J. Baltimore came to his death as the result of an injury by accident arising out of and in the course of his employment.

The order of the Industrial Commission will be reversed and the case remanded, with direction to allow the compen-

sation and expenses to which claimant is entitled under the law and the facts.

*Reversed.*